G. REID DUSENBERRY, III v. SUE BROWN DUSENBERRY (NOW FOWLER)

No. 160PA85

(Filed 5 November 1985)

**Divorce and Alimony § 30— equitable distribution—finding of affair as factor to consider—remanded**

An equitable distribution action in which the trial court found that the wife's adulterous affair was a proper factor to consider in determining the distribution of marital assets was remanded for further proceedings in accord with the principles set forth in *Smith v. Smith,* 314 N.C. 80.

Justice MEYER dissenting.

Justice BILLINGS joins in the dissenting opinion.

ON plaintiff's petition for discretionary review pursuant to N.C.G.S. § 7A-31(a) of a decision of the Court of Appeals reported at 73 N.C. App. 177, 326 S.E. 2d 65 (1985), vacating and remanding Chief District Court Judge J. B. Allen's order entered at the January 17-20, 1984, Session of ALAMANCE County District Court,

determining distribution of marital property pursuant to N.C.G.S.
§ 50-20(c).

*Holt, Spencer & Longest, by James G. Spencer, Jr., and
Hunter, Wharton & Howell, by John V. Hunter III, attorneys for
plaintiff-appellant.*

*Boyce, Mitchell, Burns & Smith, by Carole S. Gailor, attorney
for defendant-appellee.*

BRANCH, Chief Justice.

In this equitable distribution action Judge Allen found, *inter
alia,* that defendant-wife "began having an adulterous affair . . .
and began neglecting the plaintiff and their three minor children"
which conduct was a "major reason for the break-up of this mar-
riage . . . and . . . was the only serious and significant mistreat-
ment of either party by the other party during the course of this
marriage." There were other extensive findings concerning the
fault of the defendant-wife in this connection. Based upon his find-
ings, Judge Allen concluded that the "relative fault of the parties
leading to the disintegration of their marriage" was a proper fac-
tor for consideration in determining the distribution of the
marital assets. Subsequent to the entry of this order by Judge
Allen, the Court of Appeals held that fault was not a relevant fac-
tor in determining the equitable distribution of marital property.
*Wade v. Wade,* 72 N.C. App. 372, 325 S.E. 2d 260 (1984), *disc. rev.
denied,* 313 N.C. 612, 330 S.E. 2d 616 (1985); *Smith v. Smith,* 71
N.C. App. 242, 322 S.E. 2d 393 (1984); and *Hinton v. Hinton,* 70
N.C. App. 665, 321 S.E. 2d 161 (1984). The Court of Appeals
vacated Judge Allen's order and remanded the cause for a new
order "based solely upon relevant and appropriate findings." The
Court of Appeals' decision in this case was filed 19 February
1985. In the meantime, we allowed plaintiff's petition in *Smith v.
Smith,* one of the cases relied upon by the Court of Appeals in its
decision in the case now before us.

In *Smith v. Smith,* 314 N.C. 80, 87, 331 S.E. 2d 682, 687 (1985),
filed subsequent to the Court of Appeals' decision in the instant
case, we held that "marital fault or misconduct of the parties
which is not related to the economic condition of the marriage is
not germane to a division of marital property under 50-20(c) and
should not be considered."

This cause is remanded to the Court of Appeals for remand to the District Court of Alamance County for further proceedings in accord with the principles set forth in our opinion in *Smith*.

Modified and affirmed.

Justice MEYER dissenting.

Of the 58 separately numbered findings of fact made by Judge Allen in this case, approximately 10 relate to the defendant's moral or marital misconduct. Those are as follows:

(22) The Court finds as a fact that both the Plaintiff, Dr. Dusenberry, and the Defendant, now Mrs. Fowler, are 38 years of age and both are in good health. That they lived together continuously as husband and wife until sometime in August, 1980, when the Defendant, Sue Dusenberry at the time, met Winston Fowler, whom she is now married to, and that the Defendant began having an adulterous affair with Mr. Fowler and began neglecting the Plaintiff and their three minor children.

(23) The Court finds that in the spring of 1981 . . . the Defendant, Mrs. Dusenberry, began staying away from the marital home and her family more frequently, sometimes being gone for a week at a time. That in August or September of 1981, the Defendant, Sue Dusenberry, told the Plaintiff, G. Reid Dusenberry, she was seeing Winston Fowler and the Court finds that after September, 1981, . . . the Plaintiff made a good full faith effort to save their marriage and actually begged the Defendant to stop seeing Winston Fowler.

(24) The Court finds that in December of 1981, the Defendant moved out of the marital home and lived at the Colony Apartments for approximately two months. That she then returned to the marital home but continued to leave for days at a time, leaving the Plaintiff and the three minor children.

(25) The Court does find that in an attempt to save the marriage, . . . the Plaintiff arranged for the Plaintiff and Defendant to take a vacation trip to Key West, Florida, in late April, 1982. That the parties returned home at Burling-

ton, North Carolina, on Sunday and then on or about April 27, 1982, the Defendant left the home and her family again and moved to Reston, Virginia, with Winston Fowler and into a continuation of the adulterous affair.

(26) The Court finds as a fact that the Plaintiff and Defendant have lived separate and apart from April 27, 1982, and at no time have resumed the marital relationship and that an absolute divorce was granted by this Court on July 13, 1983.

(27) The Court finds [that] from April 27, 1982, when the Defendant abandoned the Plaintiff and her children and up and through the hearing of the matter on January 17-20, 1984, . . . the three minor children, Douglas, now 16, Paige, now 15, and Gregory, now 13, have continuously resided with their father, the Plaintiff in this case. And the Court finds that the Plaintiff, Dr. Dusenberry, is in fact a fit and proper person to have the primary care, custody and control of his minor children.

(28) The Court finds as a fact that the Plaintiff is not absolutely free of all fault in the break-up of this marriage, in particular, that he lost his temper on several occasions, but the Court does find as a fact from the evidence that the Plaintiff never physically assaulted the Defendant and the Court finds that the Plaintiff was faithful to the Defendant throughout the marriage. The Court further finds from all of the evidence that the Defendant's adulterous affair lasting over many months with Winston Fowler was a major reason for the break-up of this marriage between the Plaintiff and the Defendant and the Court does find as a fact that this adulterous affair was the only serious and significant mistreatment of either party by the other party during the course of this marriage.

(29) The Court does find as a fact that after the Defendant began this adulterous relationship with Winston Fowler in August of 1980, . . . she was away from the Plaintiff and their children frequently for lengthy periods of time without telling them where she was. That at one point, she lived with Winston Fowler in Virginia for 10 or 11 weeks. On many of these occasions she would not inform the Plaintiff or the

children where she was and in many instances, the Plaintiff learned of her absence when the children would call and tell him that no one had picked them up at school or at other places. The Court does find as a fact that these three minor children have suffered psychological problems as a result of the Defendant's behavior and the Plaintiff will be obligated to pay approximately $10,000.00 for continued treatment for these said problems for the minor children.

(30) The Court does find as a fact that when the Plaintiff learned of the Defendant's adulterous relationship with Winston Fowler, . . . he was hurt emotionally, that he repeatedly begged the Defendant to give up the relationship, and she consistently refused to do so, and in fact continued it until she married Winston Fowler in September of 1983. After learning of the relationship, the Plaintiff stated his willingness to forgive and forget and made considerable efforts to work on the marriage and restore it. That his efforts failed because of the refusal of the Defendant to give up the relationship with Winston Fowler. The Court does find that the Defendant committed adultery with Winston Fowler repeatedly over a period of more than two years.

(31) The Court does find as a fact that the Defendant's lengthly [sic], adulterous relationship with Winston Fowler and her refusal to give up that relationship were the factors primarily responsible for the break-down and eventually dissolution of this eighteen and a half year marriage.

(32) The Court does find as a fact that the Defendant after the divorce of the parties in July of 1983, married Winston Fowler on September 3, 1983, and now resides with her present husband, Mr. Winston Fowler, in Ohio. That Mr. Fowler has an approximate income of $75,000.00 per year.

Based upon his 58 findings of fact, including 10 of the 11 set out above relating to the marital fault of the wife, Judge Allen set out 12 conclusions of law relating to every conceivable aspect of the marital distribution. A part of conclusion number (5) relates to the marital fault of the wife:

(5) The Court, in reaching its determination as to what constitutes an equitable distribution of the marital property

between the parties, has carefully considered the . . . services of both of the parties as spouse, parent, . . . and homemaker, as well as the lack thereof, . . . and the relative fault of the parties leading to the disintegration of their marriage, consideration of which factor in this case the Court finds to be just and proper.

Based upon his findings and conclusions, Judge Allen determined that the marital assets of a net value of $402,483.85 should be allocated $134,161.28 to the wife and $268,322.57 (including the home for his rearing of the children) to the husband. Judge Allen concluded that the wife should bear $7,500 of the $10,000 projected future costs of the treatment of the children for the adjustment disorders resulting from the break-up of the marriage and reduced the $134,161.28 distribution to the wife to $126,661.28.

I am convinced that the legislature fully intended that the trial judge, in his "equitable" distribution of the marital property, could and would consider "moral" or "marital" fault (as opposed to what has been termed "property" fault) which causes the marriage to break up, without regard to its impact on the extent or value of the marital property to be distributed. Such marital fault or misconduct might include adultery, spouse abuse, incest, alcoholism, drug abuse, etc.

We have noted that the intent of the legislature to vest in our trial judges *broad* discretion in distributing marital property under N.C.G.S. § 50-20 is made manifest by the inclusion of the catchall factor, codified as subsection (c)(12), "*any* other factor which the court finds to be just and proper." (Emphasis added.) *White v. White*, 312 N.C. 770, 324 S.E. 2d 829 (1985).

Without the benefit of an official legislative history, it is difficult to demonstrate legislative intent with record evidence. It is irrefutable, however, that when the legislature enacted the Marital Property Act, it did not *exclude* fault from the broad sweep of the language of factor (12), "*any* other factor." Also, from unofficial comments of legislators involved in its enactment, it seems clear that the act was represented to the legislative body as allowing consideration of moral fault in the distribution of marital property. For example, in 2 R. Lee, North Carolina Family Law § 169.5 (Supp. 1985), there appears the following commentary reflecting comments by one of the legislators as to certain

statements of the floor mana ger of the act made on the floor of the Senate during debate on the bill:

> By including factor ('12), "Any other factor which the court finds to be just and proper" in the list of factors to be considered in determinin₁g what division of property is equitable, the General Asse mbly left open the possibility that in particular cases the marital fault of one or the other spouse might be a factor in determining equitable distribution.[17]

> In discussing the statutes shortly after their passage, W. Paul Pulley, Jr., a member of the General Assembly when the equitable distribution legislation was enacted, said:[18] "N.C.G.S. 50-10[sic](c)(12) provides as an additional factor 'any other factor which the court finds to be just and proper' [and] was another item inserted with the principal sponsors of the bill kicking and screaming all the way. Yes, I believe this does allow the potential for fault litigation in considering the amount of the equitable distribution. In fact, the floor manager for the Senate stated in floor debate that it would allow consideration of fault."

---

17. N.C. Bar Ass'n Foundation, Institute on the Practical Effects of Equitable Distribution I-7 (article by Pulley), II-4 (article by Hunt), III-3 (article by Riddle), IV-6 (article by Cannon) (1981); Herring, *An Equitable Distribution—Now Showing at a Theater Near You*, N.C. Bar Ass'n Bar Notes, vol. 32, No. 7, p. 8 (1981); Note, *The Discretionary Factor in the Equitable Distribution Act*, 60 N.C.L. Rev. 1399 (1982); Wake Forest C.L.E., N.C. Family Law Practice Handbook 323 (article by Maxwell) (1984).

18. Pulley, *The Evolution of Equitable Distribution Nationally and the Legislative History and Intent of the N.C. Act*, N.C. Bar Ass'n Foundation, Institute on the Practical Effects of Equitable Distribution I-7 (1981).

2 R. Lee, North Carolina Family Law § 169.5 (Supp. 1985).

It is also clear that close observers of the development and passage of the new act felt that, in accord with the holdings of the majority of courts of the nation, our courts would consider moral or marital fault as a factor.

Professor Sally B. Sharp of the University of North Carolina School of Law, a teacher and writer in the field of domestic relations law, had this to say about the North Carolina equitable distribution statute:

> In summary, despite strong policy arguments for no-fault property division, a majority of courts that have addressed the question without the assistance of a statutory guideline have concluded that fault is a relevant consideration in equitable distribution. It can be anticipated that North Carolina courts will follow the majority approach and treat fault as one—though not a controlling or preclusive—consideration in the balancing process.

Sharp, *Family Law, Survey of Developments in North Carolina Law, 1981,* 60 N.C.L. Rev. 1379, 1406 (1982).

The notion that serious moral or marital fault and its consequences are relevant to the equitable distribution of marital property upon divorce has been accepted by the courts of many jurisdictions. For example:

*Alabama.* In *Wicks v. Wicks,* 379 So. 2d 612, 613 (Ala. Civ. App. 1980), the court stated:

> The court could also have considered the husband's admitted adultery and the part it played in the breakdown of the marriage. He is presently living openly with his paramour within sight of the home of his wife and daughter.

*See also Ross v. Ross,* 447 So. 2d 812 (Ala. Civ. App. 1984).

*Georgia.* In *Peters v. Peters,* 248 Ga. 490, 491-92, 283 S.E. 2d 454, 455 (1981), the court, stating that adultery does not absolutely bar an equitable distribution to the guilty party, also said:

> However, where equitable division of property is in issue, the conduct of the parties, both during the marriage and with reference to the cause of the divorce, is relevant and admissible.

*Iowa.* In *Cooper v. Cooper,* 259 Iowa 277, 282, 144 N.W. 2d 146, 148 (1966), the court stated that misconduct "is material in considering what is equitable in the way of division of property."

*Michigan.* In *Arnholt v. Arnholt,* 129 Mich. App. 810, 343 N.W. 2d 214 (1983), the court stated that fault, although not a factor to be considered in divorce, might be considered in property and alimony awards. *Accord Davey v. Davey,* 106 Mich. App. 579, 308 N.W. 2d 468 (1981).

*Missouri.* The court considered fault in the case of *In re Marriage of Cornell,* 550 S.W. 2d 823, 827 (Mo. Ct. App. 1977), stating:

> Finally, on the question of the conduct of the parties, the evidence warrants a finding that Harry's extra-marital activities with Ann were a major factor in the shipwreck of a twenty-six-year marriage upon the rock of dissolution.

*See also Gray v. Gray,* 654 S.W. 2d 309, 312 (Mo. Ct. App. 1983).

*New Hampshire.* In *Ebbert v. Ebbert,* 123 N.H. 252, 459 A. 2d 282 (1983), the court noted that where a fault ground has been alleged and properly pled, evidence of fault may be considered in any award of alimony or division of property.

*North Dakota.* In *Grant v. Grant,* 226 N.W. 2d 358 (N.D. 1975), interpreting a statute not mentioning fault as a factor, the court held that conduct of the parties could be considered. *See also Larson v. Larson,* 234 N.W. 2d 861 (N.D. 1975).

*South Carolina.* In South Carolina, equitable distribution exists as a common law doctrine created by the courts, in the absence of statute. In *Lyvers v. Lyvers,* 280 S.C. 361, 312 S.E. 2d 590 (S.C. Ct. App. 1984), the court pointed out that the relative fault of the parties is a factor which the trial court *must* consider in determining the proper portion of marital property that is owned by each spouse.

*Texas.* In *Thomas v. Thomas,* 603 S.W. 2d 356, 358 (Tex. Civ. App. 1980), the court said that a division could be based upon, among other factors, "the facts which led to the divorce." *See also Bell v. Bell,* 540 S.W. 2d 432 (Tex. Civ. App. 1976).

Particularly where the moral or marital fault diminishes the contribution of a spouse to the marriage and/or results in additional expenses and efforts on the part of the innocent spouse, it should be considered in determining the "equitable" distribution of marital property. Here, Mrs. Dusenberry's lengthy absences from the home during which she made no contribution to the mar-

riage or to the care of the children, with the concomitant additional effort and expenses required of her husband for the care and upkeep of the children, together with the estimated cost of $10,000 for the continued treatment of the psychological problems of the children, suffered by them as a result of her behavior, fully justify consideration of her marital fault.

The reason misconduct directly impacting the contribution of one spouse to the marriage should be considered was stated with clarity in *Burtscher v. Burtscher*, 563 S.W. 2d 526, 527-28 (Mo. Ct. App. 1978), as follows:

We believe the conduct factor becomes important when the conduct of one party to the marriage is such that it throws upon the other party marital burdens beyond the norms to be expected in the marital relationship. The thrust of the dissolution law is to treat the marriage as a partnership to which each spouse presumably contributes equally. When the misconduct of one party changes that balance so that the other party must assume more than his or her share of the partnership load it is appropriate that such misconduct should affect the distribution of the property of that partnership. It is logical that if one party to the partnership has, because of the other's misconduct, contributed more to the partnership, he or she should receive a greater portion of the partnership assets.

I am fully convinced that, under the particular facts of this case, the marital fault of the wife was properly considered by the trial judge, even under the rigid holding of the majority in *Smith v. Smith*, 314 N.C. 80, 331 S.E. 2d 682 (1985). Even if one completely disregards the "moral" impact of the wife's conduct here, I believe the trial court properly considered as some of the factors in the distribution the repeated adultery of the wife, her consequent neglect of her husband and children, her lengthy absences from her family during her affair, the resultant lack of contribution by her to the marriage, the exclusive burden of child care and household management which she imposed on her working husband, and the severe emotional impact of her behavior on her husband and children. The Court of Appeals erred in ruling to the contrary, and the majority of this Court has erred in affirming that ruling.

Further, where matters are left to the discretion of the trial judge, he may be reversed for abuse of his discretion only upon a showing that his actions are *manifestly unsupported by reason* or that his decision is so arbitrary that it could not have been the result of a reasoned decision. *White v. White*, 312 N.C. 770, 324 S.E. 2d 829. Most assuredly, it cannot be said of Judge Allen's order in this case that it is either manifestly unsupported by reason or that it is so arbitrary that it could not have been the result of a reasoned decision.

I would vote to reverse the decision of the Court of Appeals and to reinstate Judge Allen's carefully considered and fully supported order of distribution dated and filed 19 April 1984.

Justice BILLINGS joins in this dissenting opinion.